IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA A. KAGER, | ) | CASE NO. 5:11CV01180 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Defendant. | ) | |

Plaintiff Lisa Kager ("Kager") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for social security

disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This

matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Kager filed her application for disability insurance benefits and supplemental security

income benefits on April 12, 2007.  Tr. 109-121.  The application alleged a disability onset date

of July 1, 2003.  Tr. 109.  Kager alleged disability based on bipolar disorder, obsessive-

compulsive disorder, generalized anxiety disorder, and migraine headaches.  Tr. 19, 146.  After

denials by the state agency (Tr. 74-77, 90, 96, 100, 367), Kager requested a hearing (Tr. 103),

and Administrative Law Judge Richard N. Staples ("ALJ") conducted a hearing on February 18,

2010.  Tr. 32-73.

1

In his March 5, 2010, decision, the ALJ determined that Kager had not been under a disability since July 1, 2003.  Tr. 17.  Kager requested review of the ALJ's decision by the Appeals Council on April 29, 2010.  Tr. 13.  On April 11, 2011, the Appeals Council denied Kager's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Kager was born on April 24, 1973, and was 33 years old at the time of her application. Tr. 142.  At the time of the hearing, Kager was living with her husband and four children.  Tr. 145, 154-155.  Kager completed the twelfth grade in 1991.  Tr. 152.  Part of her high school curriculum involved "diversified health" training, including CPR training and dental hygienist training.  Tr. 152.  Kager did not receive any further educational or vocational training.  Tr. 152.

Kager's past relevant work includes experience as a child daycare worker and as a home health aide.  Tr. 25.

### B.  Medical Evidence

#### 1. Physical Impairments

##### a. Treating Medical Providers (Mercy Medical Center)[1]

Kager alleged her disability began on July 1, 2003, the day she learned of her fourth pregnancy.  Tr. 110-111.  She gave birth to her fourth child on February 25, 2004.  Tr. 63. However, it was not until March 2005, nearly two years after her alleged onset date, that Kager

---

[1] The record indicates that the majority of Kager's treatment at Mercy Medical Center was provided by the following physicians: Raja Sappati Biyyani, M.D., Family Doctor; Jose Casanova, M.D., Neurologist; Moses Ijaz, D.O., Psychiatrist; Sharad Bhatt, M.D., Psychiatrist; Jean Claude Tabet, M.D., Neurological Surgeon; and various Emergency Room staff.

was treated at Mercy Medical Center for headaches.  Tr. 239.  During this visit, the ER physician diagnosed her with a stress headache.  Tr. 239.  In July 2005, Kager underwent an MRI for lower back pain.  Tr. 237.  There were no significant findings and no diagnosis was made.  Tr. 237. Following a CT scan in August 2005 for her headaches, the physician's impressions included a "normal brain" and "minimal ethmoid sinus disease."  Tr. 236.

Kager returned to the emergency room on three separate occasions in September 2005, complaining of headaches.  Tr. 227-234.  On September 9, 2005, her headache totally dissipated before treatment, and she was discharged with a diagnosis of acute exacerbation of a chronic tension headache.  Tr. 233-234.  On September 21, 2005, she started taking Topamax, but again went to the ER complaining of tension headaches.  Tr. 230.  She suffered no other symptoms and was treated with Toradol, morphine, and Phenergan.  Tr. 230.  On September 27, 2005, she again arrived at the ER with a tension headache, but she felt "significantly better" after seeing the physician's assistant and was once again diagnosed with a tension headache and discharged.  Tr. 227-229.  The examiner noted that Kager was a "healthy appearing . . . female who is laughing, pleasant, and social."  Tr. 227.  Similarly, Kager did "not appear to be in any gross discomfort" though she rated her current pain as an eight out of ten.  Tr. 227.

In October 2005, Kager underwent a CT scan of her brain.  Tr. 260.  The scan revealed a "1-2 mm signal outpouching" that raised suspicion of a "tiny aneurysm."  Tr. 260.  The physician noted that no therapy or surgery was recommended for such a small aneurysm.  Tr. 205.  She was started on Depakote and referred to Dr. Jean Claude Tabet, M.D. ("Tabet") for a surgical opinion.  Tabet ordered another CT scan (performed in February 2006) and noted that it was "similar in appearance" to the scan from October 2005.  Tr. 203.

In November 2005, Kager's primary physician, Raja Sappati Biyyani, M.D., referred her to neurologist Dr. Jose Casanova, M.D. ("Casanova").  Tr. 258-259.  Casanova's impressions were that Kager suffered from chronic daily headaches and migraines.  Tr. 257-259.  In December 2005, Casanova altered Kager's prescriptions and again mentioned referral to a neurosurgeon for an opinion, but noted that at that time, she likely did not require surgical intervention.  Tr. 257.

Between 2005 and 2009, Casanova continued to treat Kager for headaches.  Tr. 243-256. During this time, Kager was prescribed more than 20 different medications to treat her headache symptoms.[2]  The doses were raised, lowered, and otherwise altered numerous times, attempting to find a combination that worked.  Doc. 13, pp. 3-4.  The record indicates that the medications were ineffective at preventing the occurrence of headaches, but some helped reduce the symptoms once a headache started.  Tr. 57.  As of May 26, 2009, Kager was still complaining of daily headaches and Casanova noted that no medications were effective at prevention, but prescribed medications to treat the acute onset of her headaches.  Tr. 414.

Casanova did not provide a statement regarding Kager's functional limitations resulting from her physical impairments.

**2. Mental Impairments**

 **a. Treating Medical Providers**

<u>***Shishuka Malhotra, M.D.***</u>

Kager's primary physician, Raja Sappati Biyyani, also referred Kager to psychologist Shishuka Malhotra ("Malhotra") for therapy on July 15, 2005.  Tr. 317.  Kager complained of feeling overwhelmed and stated that her children were her primary stressors.  Tr. 320.  Malhotra

---

[2] This number does not include prescriptions for Kager's other mental disorders.

4

diagnosed Kager with Bipolar II- Hypomanic and Obsessive-Compulsive Disorder ("OCD").  Tr. 326.  Kager followed up with an office visit on August 13, 2005.  Tr. 322.  She discussed her family life and her OCD symptoms.  Tr. 322.  In October 2005, Malhotra adjusted her medications and recommended follow-up appointments with her therapist.  Tr. 316.  Progress notes are substantially the same through April 2006, at which time Kager was referred to Dr. Moses Ijaz, D.O. because Malhotra did not accept Kager's insurance.  Tr. 306-316.

Malhotra did not provide a statement regarding Kager's functional limitations resulting from her mental impairments.

### *Moses Ijaz, D.O.*

Kager first saw Dr. Moses Ijaz, D.O. ("Ijaz") on June 19, 2006.  Tr. 299-302.  During her initial psychiatric evaluation, Kager complained of feeling overwhelmed and being unable to "keep up."  Tr. 299.  Ijaz noted "bizarre" and "magical thinking" and diagnosed Kager with a Mood Disorder (not otherwise specified), postpartum OCD, and Severe General Anxiety Disorder.  Tr. 299-301.  Further, Ijaz assessed Kager's Global Assessment of Functioning ("GAF") score at 55.[3]  At her second visit on August 7, 2006, Ijaz added a diagnosis of Bipolar Disorder.  Tr. 297.  Again, on September 7, 2006, Kager saw Ijaz and complained of irritable, reactive behavior and that her OCD symptoms "drive her to exhaustion."  Tr. 290.  There was no change in diagnoses, but Ijaz increased the dosage for most of her medications.  Tr. 290-291, 287.

---

[3] GAF considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington D.C., American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends). Id.

There were no notable changes in Kager's condition from October 2006 to April 2007. Tr.  269-283.  She continued to suffer from severe anxiety, OCD, and bipolar disorder, trying various prescriptions and doses with minimal effects on her temper and sleep quality.  Tr. 269-283.  On April 2, 2007, Ijaz encouraged Kager to apply for disability benefits, stating she was "incapacitated to work."  Tr. 267.  On June 4, 2007, Ijaz indicated that because of her chronic mood disorder, Kager was "functionally disabled."  Tr. 356.

### Sharad H. Bhatt, M.D.

Kager started seeing another psychiatrist, Dr. Sharad H. Bhatt, M.D. ("Bhatt") in October 2008.  Tr. 402.  Bhatt diagnosed Kager with OCD.  Tr. 407.  On Kager's first follow-up visit she appeared calm, alert, and cooperative.  Tr. 407.  On October 30, 2008, Kager reported feeling anxious, uptight and irritable.  Tr. 398.  In February 2009, Bhatt revised his diagnosis to include bipolar disorder.  Tr. 390.  Through June 2009, the notes were substantially similar.  Tr. 388-400. In August 2009, Bhatt noted slight improvement; Kager's condition was stable, her sleep, appetite, mood, and energy were good, and she was suffering no side effects.  Tr. 409.

#### b.  State Agency Reviewing Physician

### Mel Zwissler, Ph.D.

On July 9, 2007, Mel Zwissler, Ph.D. ("Zwissler") completed a Psychiatric Review Technique (Tr. 333-346) and Mental Residual Functional Capacity Assessment (RFC).[4]  Tr. 347-350.  He reviewed Kager's alleged impairments under Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Disorders) and determined that her impairments did not satisfy the diagnostic criteria for a Listing, but that Kager suffered from Bipolar Disorder, OCD, and General Anxiety

---

[4] Caroline Lewin, Ph.D. reviewed the evidence on file and affirmed Zwissler's assessment on October 30, 2007.  Tr. 366.

Disorder.[5]  Tr. 336, 338.  Zwissler found moderate limitations in maintaining both social functioning and in concentration, persistence or pace, but no restriction of activities of daily living.  Tr. 343.  Zwissler did not find evidence that Kager (1) had experienced any episodes of decompensation for an extended duration, (2) was unable to function outside of a highly supportive living arrangement, or (3) that a marginal adjustment in mental demands, or change in environment, would cause her to decompensate.  Tr. 344.  Consequently, Kager failed to meet the criteria set forth by paragraphs "B" and "C" of the Listings.  Tr. 344.

In the RFC, Zwissler found only one marked limitation – on Kager's ability to interact appropriately with the general public.  Tr. 348.  Zwissler found moderate limitations in the following five areas: (1) maintaining attention and concentration for extended periods; (2) working in coordination with or proximity to others without being distracted by them; (3) completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and; (5) responding appropriately to changes in the work setting.  Tr. 347-348.  In the remaining fifteen areas, Zwissler found either no evidence of limitation or that Kager was not significantly limited.  Tr. 347-348.

Zwissler gave weight to the "totality of the evidence" and noted that Kager's statements were credible and consistent with the medical evidence.  Tr. 349.  He summarized his findings by stating that Kager would perform best at tasks that required only superficial contact with others.  Tr. 349.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

### C. Testimonial Evidence

#### 1.    Kager's Testimony

Kager was represented by counsel and testified at the February 18, 2010, hearing.  Tr.32-73.  She testified that her impairments became severe on February 25, 2004.  Tr. 63.  She also testified regarding her physical and mental ailments and capabilities; her past work as a cleaner, daycare worker, and home health aide; her living arrangements, including living with her husband and her four children, aged 6, 9, 14, and 18; her ability to care for herself and her children; her daily living activities, including driving, non-stop cleaning, constant worrying, shopping for groceries and children's items, and preparing all meals; her OCD and its impact on her ability to work (her inability to progress from one task to another within the allotted time); her social interactions, including regular phone conversations with her parents and attending some school functions, but not watching TV, movies, using the computer, going to dinner or movies, or otherwise participating in leisure activities; her migraine headaches; the side effects of her medications; her fear of fires, assault, and general danger to her children (they may get shot, stolen, blown-up, or killed); her obsession with cleanliness and showering; her trouble sleeping due to worry; the stress associated with leaving her house; her aneurysm; and her inability to touch other people.  Tr. 37-71.

#### 2.    Vocational Expert's Testimony

Vocational Expert Carol Mosley, M.A. ("VE") testified at the hearing.  Tr. 60-73.  After reviewing Kager's vocational history, the VE testified that Kager's work as a daycare worker was classified as light and semiskilled, and her work as a cleaner as light and unskilled.  Tr. 61-62.

The ALJ posed two different hypotheticals to the VE.  First, he asked the VE whether an individual based on the following hypothetical could return to Kager's past relevant work as a daycare worker:[6]

> Please consider an individual the same age, education, and work experience as Ms. Kager . . . [who] doesn't have any exertional limitations, but they're limited to unskilled work involving simple, repetitive tasks.  They're limited to low stress work, and by low stress I mean no high production quotas.  And the individual is also limited to no more than superficial interaction with anyone, public, co-workers, or supervisors.

Tr. 65.  The VE testified that an individual based on the hypothetical could not perform Kager's past work as a daycare worker because they would be precluded by the skill level and social interaction required.  Tr. 65.[7]

The ALJ then asked the VE whether there would be any jobs available to an individual in the economy based on the hypothetical presented.  Tr. 65.  The VE testified that yes, there were jobs available in the regional and national economy and her examples included: packer, building cleaner, and sorter.  Tr. 66-67.

The ALJ posed a second hypothetical to the VE, and asked whether they would be able to perform the three jobs that the VE listed, or any other jobs on a competitive sustained basis, based on the following:

> This person is still limited in the same way as the person in the fist hypothetical, but this individual would be off task at least twenty percent of the time because of psychiatric issues.

Tr. 67.  The VE testified that no, that person would not be able to work as a packer, building cleaner, or sorter.  Tr. 67.  The VE testified that her testimony was consistent with the information contained in the Dictionary of Occupational Titles DOT.  Tr. 61.

---

[6] The ALJ determined that Kager's work as a cleaner was not substantial gainful activity.

[7] Kager's attorney pointed out that the ALJ and VE failed to consider Kager's past work as a home health aide in their analysis.  Tr. 69-70.  The VE testified that work as a home health aide was classified as medium and that the hypothetical person would be precluded from performing that job because of the restriction to only superficial contact with others provided in the hypotheticals.  Tr. 71-73.

### D.  Lay Person Evidence

#### 1.        Third-Party Function Report

In June 2007, Kager's spouse, Brian Kager, completed a third-party function report.  Tr. 164-171.  Brian reported that, after Kager woke up, she showered, cared for the kids, and completed household chores.  Tr. 164-65.  He noted that she didn't sleep much but had no problems with her personal care.  Tr. 165.  Brian noted that "she does everything from dinner to laundry, everything" for her children and husband.  Tr. 166.  He stated that she got the mail, drove a car, and went grocery shopping two to three times per week.  Tr. 167.  Brian wrote that Kager watched t.v. and collected candles.  Tr. 168.  He noted that she socialized with others once or twice a week and brought her daughter to dance classes.  Tr. 168.  Brian indicated that she had trouble with her memory and concentration because "her mind is racing too much."  Tr. 169.  He noted that Kager couldn't handle stress well and adapted poorly to change.  Tr. 170.  Brian wrote that she slept facing the door and feared house fires.  Tr. 170.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity and vocational factors to perform work available in the national economy.  Id.

## IV. The ALJ's Decision

In his March 5, 2010, decision, the ALJ determined that Kager had not been under a disability since July 1, 2003, the date of the alleged disability onset.  Tr. 26.  The ALJ reviewed the record, heard testimony, and found that:

1.  Kager met the insured status requirements of the Social Security Act through September 30, 2009.  Tr. 19.

2.  Kager had not engaged in substantial gainful activity since the alleged onset date.  Tr. 19.

3.  Kager had the following severe impairments: bipolar disorder, obsessive-compulsive disorder, generalized anxiety disorder, and migraine headaches.  Tr. 19.

4.  Kager did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  Tr. 20.  In reviewing the listings, the ALJ assessed Kager's mental impairments, activities of daily living, social functioning, ability to concentrate, and evidence of decompensation.  Tr. 20-21.  The ALJ specifically referred to Listing 12.04 and Listing 12.06.  Tr. 20.

5.  Kager had the RFC to perform a full range of work at all exertional levels but was limited: to unskilled work involving only simple, repetitive tasks; low stress work that does not involve high production quotas; and superficial interaction with the public, co-workers, and supervisors.  Tr. 21.

6.  Kager was unable to perform any past relevant work.  Tr. 25.

7.  Kager was a younger individual on the alleged onset date.  Tr. 25.

8.  Kager had at least a high school education and was able to communicate in English.  Tr. 25.

9.  Transferability of job skills was not an issue because Kager is "not disabled" regardless of whether or not she has transferable job skills.  Tr. 25.

10.  Considering Kager's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Kager can perform, specifically: building cleaner, packer, and sorter  Tr. 25-26.

11.  Kager was not under a disability from July 1, 2003 through March 5, 2010, the date of the ALJ's decision.  Tr. 26.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

Kager makes several broad challenges to the ALJ's decision, largely indicating that there is insufficient evidence to support the ALJ's decision.  Doc. 13, p. 1.  First, Kager asserts that the ALJ's credibility determination was not reasonable and is not supported by the evidence.  Doc. 13, p. 9.  Second, Kager alleges that the ALJ violated the "treating physician rule" because he improperly disregarded two statements by Ijaz regarding Kager's functional limitations, i.e., that Kager was "incapacitated to work" and that she was "functionally disabled."  Doc. 13, p. 11, Tr. 267, 356.  Third, Kager argues that the ALJ overly relied on Zwissler's psychiatric review.  Doc. 13, pp. 11-12.  Fourth, Kager claims that the ALJ failed to include limitations based on Kager's migraines—a severe medical impairment—and the side effects from the drugs prescribed for their treatment.  Doc. 13, pp. 12-13.

Kager asks the Court to reverse the ALJ and enter judgment in her favor, entitling her to disability benefits.  Doc. 13, p. 13.

### B.    Defendant's Arguments

The Commissioner argues that substantial evidence supports the ALJ's decision that Kager is not disabled.  Doc. 18, p. 11. Further, the Commissioner contends that the ALJ reasonably assessed Kager's subjective complaints and the evidence supports the ALJ's credibility determination.  Doc. 18, p. 3.  The Commissioner argues that the two statements made by Ijaz regarding Kager's employability, i.e., that Kager was "incapacitated to work" and "functionally disabled," were not medical opinions but statements on a issued reserved to the Commissioner, and thus were entitled to no special significance.  Doc. 18, p. 8.  The Commissioner argues that the ALJ could not have overly relied on Zwissler's opinion because

the ALJ expressly gave Zwissler's opinion less weight.  Doc. 18, p. 9.  Finally, the Commissioner states that Kager's migraines, diagnosed as a severe medical impairment, pose no further functional restrictions than the limitations included in the RFC.  Doc. 18, p. 10.

The Commissioner states that, even if the Court finds reversal necessary, a judicial award of benefits would be improper because it requires an "overwhelming proof" of disability.  Doc. 18, p. 10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); Wright v. Massanari, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Besaw v. Sec'y of Health & Human Servs., 966 F.2d 1028, 1030 (6th Cir. 1992).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." McClanahan v. Comm'r of Soc. Sec., 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g).  Even if substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  Despite Kager's contentions, the ALJ's findings are supported by substantial evidence.

14

**A.**     **The ALJ properly assessed Kager's credibility.**

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for

assessing the credibility of an individual's subjective statements about his or her symptoms,

including pain and fatigue.  First, the ALJ must determine whether a claimant has a medically

determinable physical or mental impairment that can reasonably be expected to produce the

symptoms alleged; then the ALJ must evaluate the intensity, persistence, and functional

limitations of those symptoms by considering objective medical evidence and other evidence,

including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other

symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side

effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than

medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain

or other symptoms; and (7) other factors concerning functional limitations and restrictions due to

pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 SSR LEXIS 4, at

*5–8 (1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded

great weight and deference, particularly since an ALJ is charged with the duty of observing a

witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility

must be supported by substantial evidence."  Calvin v. Comm'r of Soc. Sec., 437 F. App'x 370,

371 (6th Cir. 2011) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997)).

Here, the ALJ did consider the entire case record and conducted a thorough credibility analysis.

Tr. 22-25.

The ALJ recognized that Kager satisfied the first step, i.e., that she had a medically

determinable physical or mental impairment that can reasonably be expected to produce the

symptoms alleged, but also determined that Kager's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC.  Tr. 22.  The ALJ did not deny that Kager suffered from migraines, an inability to concentrate, or difficulty in handling stress.  Rather, the ALJ found that Kager's symptoms do not limit her functionality beyond the RFC, and thus do not preclude her from performing a full range of work at all exertional levels with the limitations outlined in the RFC. Tr. 23-25.

In his decision, the ALJ reviewed, inter alia: (1) Kager's written statements; (2) her testimony; (3) her earning records; (4) the CT scans of her aneurysm; (5) her husband's written statement; (6) the Emergency Room records; (7) her neurologist's (Casanova) recommendations and notes; (8) her prescription drug treatments and their side-effects; (9) her psychiatrists' (Malhotra, Ijaz, and Bhatt) recommendations and notes; (10) and the state agency physicians' opinions about her residual functional capacity.  Tr. 22-25.  These specific references demonstrate a thorough review of the entire record.

In view of the entire record, the ALJ determined that Kager's statements concerning her symptoms were not credible to the extent they conflict with the RFC and cited numerous reasons including:

(1) Her poor work history prior to the alleged onset date, demonstrating a trend "generally below [that] which would represent substantial gainful activity," and noting that her continued work after the alleged onset date suggests that her impairments are not as functionally limiting as alleged,

(2) The inconsistency between the alleged onset date, July 1, 2003, her own testimony that her impairments were not severe until February 24, 2004, and her failure to seek any treatment for the alleged disabling condition until March 5, 2005,

16

(3) The lack of objectively verifiable causes for headaches that often cured themselves without treatment,

(4) The absence of regularly observed clinical signs of psychological impairment, and

(5) Her husband's written statements that contrast with her testimony about socializing and performing leisure activities.  Tr. 23-25.

Kager disagrees.  Doc. 13, pp. 9-11.

Kager explains that her "poor work history" prior to the alleged onset date may have been due to her duties as a mother and that, in some years, she was a stay-at-home mom, reflecting a valid choice rather than evidence of a poor employment history.  But the ALJ further points out that Kager's employment after the alleged onset date suggests her symptoms may be less functionally limiting than claimed.  Tr. 23.  Kager does not refute this specific finding and only contests the inferences based on her work before the alleged onset date.  While Kager may have had difficulty maintaining consistent substantial work while raising four children, her ability to work for more than two years following the alleged onset date detracts from her claims of severity.  Consequently, the ALJ's credibility determination is not improper based on his reliance on Kager's work history.

There simply is no objective evidence to support Kager's claim that her OCD worsened beginning July 1, 2003.  In her application for benefits Kager claimed that the alleged onset date of July 1, 2003, was significant because that was when she first learned that she was pregnant with her fourth child.  Tr. 110-111.  But, at the hearing, when asked directly why she used that date, Kager testified that she didn't know, and guessed that it may have coincided with the loss of her daycare job.  Tr. 65.  She also testified that her OCD only worsened after the birth of her fourth child on February 25, 2004.  Tr. 64.  When she finally sought treatment in March 2005, it

was not for the OCD—but for migraines.  Tr. 110-111.  Kager wasn't seen by a psychologist for her OCD until July 2005- a full two years from the alleged onset date.  Tr. 322.  Kager's failure to provide any reasonable explanation for the alleged onset date and subsequent delay in treatment supports the ALJ's finding that Kager is not fully credible.

Kager notes that her husband's written statement—that she sometimes watched television—was made more than two years before Kager's testimony to the contrary, and should not detract from her credibility.  Doc. 13, p. 9.  Essentially, Kager implies that, while she may have watched TV in the past, that was not the question posed at the hearing; and that because she no longer watched television at the time of the hearing, the two statements are compatible.  The ALJ is not precluded from considering evidence of third party reports and therefore his reliance thereon cannot be deemed improper.  Furthermore, when viewed as a whole, Brian Kager's statements fail to show any functional limitations and demonstrate that Kager is capable of performing the tasks necessary to care for a family of six in every meaningful way.  Brian Kager's report shows no impact on his wife's ability to function in her various household roles.  Regardless of whether Kager does or does not watch TV, her husband's report conflicts with her alleged limitations and may be considered further proof of her functional capacity.

Lastly, Kager disputes the ALJ's finding of "little evidence of consistently noted, positive clinical findings" and sporadic reports of her symptoms throughout the course of her treatment.  Doc. 13, p. 10.  Kager states that she continually and consistently reported the same symptoms from her mental disorders and that the history of prescriptions aimed at treating those symptoms was sufficient to show consistent, positive clinical findings.  Oddly, Kager alleges that the ALJ completely failed to consider her medications and their side effects.  Doc. 13, pp.10-11 ("[T]here is no mention whatsoever of the medications Ms. Kager took for her emotional impairments.").

However,  the ALJ did specifically address Kager's medications and her testimony about their side effects in his opinion, noting that the "evidence as whole indicates that the medications prescribed . . . are effective in reducing her symptoms and that any side effects . . . impose no function limitations in addition to or greater than those [in the RFC]."  Tr. 24.  Additionally, treatment notes show that, in May 2009, Kager had been able to stop her psychiatric medications; she reported to Dr. Casanova being more nervous, but feeling better.  Tr. 414.

The ALJ's credibility determination deserves great deference and the court cannot substitute its opinion for the ALJ's if the ALJ's analysis was proper.  Here, the ALJ followed the applicable procedures and properly assessed Kager's credibility based on the entire record, including his own observations.  Thus the ALJ's finding that Kager was less than fully credible regarding the severity of her symptoms is appropriate and should be affirmed.

**B.      The ALJ did not violate the "treating physician rule."**

Kager argues that the ALJ's decision should be reversed because the ALJ did not articulate his reasons for not giving controlling weight to a treating psychologist's (Dr. Ijaz) opinion, i.e., two statements by Kager regarding her employability: (1) that she was "incapacitated to work;" and (2) that she was "functionally disabled."  Doc. 13, p. 11, Tr. 267, 356.  The Commissioner argues that Ijaz's statements were not medical opinions and, if they were, there is substantial evidence to support the ALJ's decision not to give Ijaz's opinion controlling weight and, in any event, the ALJ's treatment of Ijaz's opinion was harmless error because the RFC incorporates all of Kager's functional limitations.  Doc. 18, pp. 7-9.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

case record." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §
404.1527(d)(2).  The Commissioner's regulations impose a clear duty always to give good
reasons for the weight given to treating source opinions.  Cole v. Comm'r of Soc. Sec., 661 F.3d
931, 937 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d)(2)).  "Those good reasons must be
supported by the evidence in the case record, and must be sufficiently specific to make clear to
any subsequent reviewers the weight the adjudicator gave to the treating source's medical
opinion and the reasons for that weight."    Cole, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-
2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Not every comment by a treating physician is a medical opinion.  For example, "[a]
statement by a medical source that [the applicant is] "disabled" or "unable to work" does not
mean that [the Social Security Administration] will determine that [the applicant] is disabled."
20 C.F.R. § 404.1527(d)(1).  Ijaz's April 2007 statement that Kager was "incapacitated to work"
and his June 2007 statement that she was "functionally disabled," (Tr. 267, 356), are conclusory
statements on matters reserved to the Commissioner, and therefore, are not entitled to be given
any special weight. Id. at (d)(3).

## C.    The ALJ properly considered and weighed opinion evidence.

Kager alleges that the ALJ may have relied too heavily on Zwissler's psychiatric review
and that Zwissler's statements were contradictory because he found Kager to be generally
credible yet discounted her subjective complaints.  Doc. 13, p. 11.  But, the ALJ explicitly stated
that Zwissler's opinion was given "less than full weight" because evidence from the hearing
suggested Kager was more limited in her ability to concentrate than Zwissler indicated.  Tr. 24.
This clearly contradicts any assertion that the ALJ relied too heavily on Zwissler's opinion.
Further, while Zwissler's notes for the RFC include a comment that Kager's statements were

20

"credible and consistent with the medical evidence," the very next sentence reads, "Wt. (weight) given to the totality of the evidence." Tr. 349.  In viewing the entire record, including Kager's credible subjective statements, and the medical evidence before him, Zwissler determined that Kager "appears able to handle tasks that only require superficial contact with others."  Tr. 349.

Moreover, Kager attempts to discredit Zwissler's opinion on the basis that there were treatment notes from Dr. Malhotra beginning on July 15, 2005, and from Dr. Ijaz beginning on June 9, 2006.  Doc. 13, pp. 11-12.  She claims that because Zwissler said there was insufficient evidence in the record from the alleged date of onset to March 31, 2007, Zwissler must not have reviewed the treatments notes from Malhotra and Ijaz beginning in 2005 and 2006.  Doc. 13, p. 12.  Zwissler's note concerning insufficient evidence reads, "T2 insufficient from AOD of 7/1/03 to 3/31/07." Tr. 345.  From this note, it cannot be said that Zwissler did not review evidence in the file.  The fact remains, and Kager acknowledges, that there is a lack of treatment for the allegedly disabling conditions dating back to the alleged onset date of July 1, 2003.[8] Accordingly, Kager's attempt to discredit Zwissler's opinion based on his reference to "insufficient evidence" or the ALJ's reliance on Zwissler's opinion is without merit.

While Zwissler may have found that Kager's statements about the severity of her symptoms were generally credible, he also found insufficient evidence to support the onset date she alleged, and his opinion about her general credibility does not establish that her functional limitations were greater than the ALJ found.

### D.    Kager's migraines imposed no further functional limitation beyond her assessed RFC.

Kager claims that the ALJ failed to include functional limitations based on her migraines—a severe medical impairment—and the side effects from the drugs prescribed for

---

[8] Kager indicates in her Brief on the Merits, "[t]he first medical record involving one of her alleged impairments in the record is an emergency room visit on March 5, 2005."  Doc. 13, p. 2.

their treatment.  Doc. 13, pp. 12-13.  The Commissioner argues that a diagnosis of an impairment does not necessarily indicate disabling functional limitations.  Doc. 18, p. 10.

The ALJ found that Kager's migraines were a severe medical impairment, but did not believe that her headaches imposed limitations beyond those he included in the RFC.  Kager claims that the ALJ failed to consider the severity of her headaches and the side effects of the medication, citing Tr. 414 (treatment notes from Casanova dated May 2009).  Yet in his decision, the ALJ specifically cited the treatment provided by Casanova since November 2005, and specifically cited exhibit 18F, which includes Tr. 414.  Further, the ALJ relied on Kager's migraine treatment as evidence that damages her credibility, noting that no headaches were ever substantiated by abnormal test results, that Kager often opted to skip headache treatment, and that she was seen laughing while complaining of significant pain.  Tr. 23.  It is clear, from a reviewing perspective, that the ALJ considered Kager's headaches but did not find that they limited her ability to function to the extent she claimed.  This finding is supported by substantial evidence as reflected in the ALJ's decision.

While Kager alleges that the ALJ failed to incorporate "the limitations caused by this severe impairment" into the RFC and states that these impairments "more than minimally" affected her ability to engage in work activity, she does not describe how or in what manner they affected her ability to work.  Doc. 13, p. 13.  Nor does Kager cite any case law to support her claim that an impairment is a per se limitation.  Doc. 13, p. 13.  Presumably Kager prefers the ALJ's second hypothetical to the VE, which included a limitation that the individual be off-task for twenty percent of the time.  Yet, Kager has not described the duration of her migraines, how quickly they subsided after taking medication, or any time away from work caused by her headaches.  Moreover, Kager herself testified that her OCD was the primary reason she was

unable to work.  Tr. 42 (ALJ: "Is there anything else I should know about that makes it difficult

for you to work?" Kager: "It is the obsessive-compulsive disorder.  It is that.").  While Kager

mentioned that her headaches were debilitating when they occurred, she acknowledged that her

medications had them somewhat under control.  Tr. 42 (ALJ: "[T]hey kind of got your headaches

under control now-- that's not correct?" Kager: "It's correct . . .").

## VI. Conclusion and Recommendation

For the foregoing reasons, it is the undersigned's recommendation that the

Commissioner's decision be **AFFIRMED**.

Dated:  July 2, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See United States v. Walters, 638 F.2d 947 (6th Cir.
1981).  See also Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).